UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:                                           CASE NO. 07-bk-00575-ABB

F.F. STATION, LLC.,                              CHAPTER 11
a Florida limited liability company,

          Debtor.
_____/

F.F. STATION, LLC,                               Adv. Pro. No.
a Florida limited liability company,

          Plaintiff,
vs.

FOLEY & LARDNER, LLP,
a Wisconsin limited liability partnership,

          Defendant.
_____/

## COMPLAINT

Plaintiff, F.F. Station, LLC ("FF Station" or "Plaintiff"), as the above-captioned debtor, hereby sues Defendant, Foley & Lardner, LLP ("Foley" or "Defendant"), a Wisconsin limited liability partnership, with its principal place of business located in Milwaukee, WI, and alleges, upon information and belief, as follows:

### Nature of the Action

1. This is an adversary proceeding brought pursuant to Sections 544, 548 and 550 of Title 11 of the United States Code (the "Bankruptcy Code"), Chapter 726, Florida Statutes, and Rule 7001 of

the Federal Rules of Bankruptcy Procedure, seeking to avoid actual and constructively fraudulent conveyances.

## Jurisdiction and Venue

2. This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. §§ 1334 and 157.

3. Venue is proper in this district under 28 U.S.C. § 1409.

4. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H).

## The Parties

5. Plaintiff, FF Station is a Florida limited liability company with its principal place of business at 2100 Lee Road, Suite F, Winter Park, Florida 32789.

6. Defendant, Foley is a Wisonsin limited liability partnership with its principal place of business in Milwaukee, WI.

7. Louis J. Pearlman Enterprises, Inc. ("LJPE") is a Florida corporation with its principal place of business in Orlando, Florida. On April 18, 2007, LJPE filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division, case no. 6:07-bk-01505-ABB (the "LJPE Bankruptcy Proceeding").

8. Trans Continental Studios, Inc. ("TCS") is a Florida corporation with its principal place of business in Orlando, Florida.

9. TOTP, LLC ("TOTP") is a florida limited liability company with its principal place of business located in Orlando, Florida.

10. Louis J. Pearlman ("Pearlman") is an individual and a resident of the State of Florida. Pearlman was the managing member and registered agent of FF Station and the director and registered agent of LJPE.

11. Trans Continental Airlines, Inc. ("TCA") is a Florida corporation with its principal place of business in Orlando, Florida.

12. Trans Continental Records, Inc. ("TCR") is a Florida corporation with its principal place of business in Orlando, Florida.

13. Trans Continental Jet Shares, LLC ("TCJ") is a Delaware limited liability company with its principal place of business in Orlando, Florida.

### History and Structure of FF Station

14. On or about March 23, 2001, Robert I. Kling ("Kling") formed FF Station as a limited liability company pursuant to the Florida Limited Liability Company Act. Kling, either in his individual capacity or through L.L. Church Street, LLC ("LLCS"), was the managing member of FF Station until October 11, 2005.

15. FF Station owned the real property located at 76-129 West Church Street and 124 West Pine Street in Orlando, Florida, which consisted of several buildings and businesses (collectively, "Church Street Station"). The Church Street Station complex was originally constructed around Orlando's original train station. The designers paid a lot of attention to detail and historical accuracy. The Train Depot was listed in the National Registry of Historic Places and contained numerous historical artifacts. The most

impressive artifact was "Old Duke", a steam locomotive that was in the movie Wings of Eagles with John Wayne.

16. The restored train station along with the old-fashioned bar Rosie O''Grady's Good Time Emporium swelled in popularity until eventually a whole 10 block area of restored buildings was created with numerous restaurants, nightclubs, banquet facilities and comedy clubs. Church Street Station also offered live entertainment, fine dining and the Church Street Exchange Shopping Emporium - a three story complex that had over 50 shops, restaurants and midway games.

17. On or about July 1, 2002, Kling, LLCS, and TCS executed a Third Amended and Restated Operating Agreement (the "Third Operating Agreement"). Pursuant to the Third Operating Agreement: (i) TCS obtained a fifty percent (50%) membership interest in FF Station; (ii) Kling's membership interest in FF Station was reduced to thirty percent (30%); and (iii) LLCS's membership interest in FF Station was reduced to twenty percent (20%).

18. On or about June 29, 2005, LJPE purchased Kling's membership interest in FF Station. In addition, LLCS transferred its' remaining two percent (2%) membership interest to Kling. Thereafter, Kling resigned as manager of FF Station and on October 14, 2005, Pearlman, as president of LJPE, became the sole managing member of FF Station.

19. By December 6, 2006, LJPE had obtained ninety-eight percent (98%) of the membership interest in FF Station, while Kling maintained his two percent (2%) membership interest in FF Station. On or about December 6, 2006, Kling and LJPE executed an Amendment to the Third Operating Agreement

("December Amendment"), which created two (2) classes of membership interests in FF Station, Class "A" Membership Interest and Class "B" Membership Interest.

20. Pursuant to the December Amendment: (i) Kling's two percent (2%) membership interest in FF Station, became a two percent (2%) Class B Membership Interest in FF Station; and (ii) LJPE ninety-eight percent (98%) membership interest in FF Station, became a one hundred percent (100%) Class A Membership Interest in FF Station and a ninety-eight percent (98%) Class B Membership in FF Station.

21. On or about February 19, 2007, LJPE executed another amendment to the Third Operating Agreement ("February Amendment"), which named Michael Moecker as the sole managing member of FF Station. LJPE and Pearlman ceased all continuing involvement with FF Station.

22. On February 20, 2007 ("Petition Date"), FF Station filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

23. On July 7, 2008, the Bankruptcy Court entered an order confirming (the "Confirmation Order") the Amended Plan of Liquidation submitted by FF Station, dated April 23, 2008 (the "Plan"). Pursuant to the terms of the Plan, FF Station, through its president, Terry J. Soifer, will serve as Disbursing Agent for all distributions to be made under the Plan and will oversee and direct all actions required under the Plan, the Bankruptcy Code, or by order of the Bankruptcy Court, including all claims objections and causes of action.

## Pearlman and The E.I.S.A. Investment Scheme

24. From January 2003 until December 2006, TCA collected approximately $118 million from investors through a TCA program called Employee Savings Investment Account ("E.I.S.A."). The State of Florida, Office of Financial Regulation ("OFR") conducted an investigation of TCA's E.I.S.A. program. As a result of the investigation, the OFR determined that a significant amount, if not all, of the E.I.S.A. funds are gone.

25. According to the OFR, TCA, Trans Continental Airlines Travel Service Inc. ("TCA Travel"), Trans Continental Enterprises, LLC ("TCE"), Pearlman, Robert Fischetti ("Fischetti") and Michael Crudele ("Crudele") (collectively, the "Trans Con Entities") violated the registration and anti-fraud provisions of Chapter 517, Florida Statutes, and the prohibitions against soliciting or receiving funds for deposit without being authorized to do business in the State of Florida as a financial institution as set forth in Chapter 655, Florida Statutes, by offering and selling unregistered securities identified as the E.I.S.A. program.

26. The E.I.S.A. program investors were not required to be employees of TCA, and with few exceptions the E.I.S.A. investors were in fact not employees or family members of the employees of TCA.

27. Investors in the E.I.S.A. program were advised by the E.I.S.A. offering documents as well as by sales agents, who worked at the direction of Pearlman and Crudele, that in exchange for an investor depositing funds in the E.I.S.A. program, an investor would earn "high yield Money Market" interest rates.

28. The Trans Con Entities engaged in securities fraud by making a variety of misrepresentations that caused individual E.I.S.A. investors to believe that their investments were safe,

secure and deposited with U.S. financial institutions, and allegedly guaranteed by the FDIC and other insurance. However, the existence of FDIC or other insurance was a fabrication in addition to the false representations that all E.I.S.A. funds were maintained in U.S. institutions.

29. The E.I.S.A. funds were deposited into various checking accounts in the name of TCA. Under the E.I.S.A. program, these funds were supposed to be transferred to FDIC insured financial institutions where the funds would generate higher than average dividends. Investors were led to believe that TCA would continue to provide account information on "Trans Continental" account statements reflecting "available balance," "insured amount," and "interest rate." Such account statements were in fact provided to investors.

30. However, rather than invest the E.I.S.A. funds, the Trans Con Entities used the approximately $118 million to pay earlier investors both dividends and cash withdrawals, to pay commissions to sales agents who marketed the program, and to funnel money to insiders and related business entities, including LJPE According to the OFR investigation, LJPE received $34,000,000.00 from the E.I.S.A. funds.

31. On February 2, 2007, the OFR filed an amended verified complaint for temporary and permanent injunction and appointment of receiver against the Trans Con Entities and twelve other relief defendants, including FF Station (the "OFR Litigation"). The OFR Litigation is based upon the OFR's investigation of a "ponzi" scheme allegedly operated by Pearlman and certain companies owned by him with respect to the sale of unregistered securities or investments, also known as the E.I.S.A. program.

32. However, the OFR did not allege and does not assert that FF Station engaged in the sale of unregistered securities or other such investments. On February 2, 2007, Gerald A. McHale, Jr. was appointed as receiver over certain Pearlman entities. On February 23, 2007, a hearing was scheduled on a motion to appoint Mr. McHale as a receiver for all of the relief defendants ("Receiver Hearing"). However, the Receiver Hearing was stayed as to FF Station by virtue of the bankruptcy filing. Although, at the Receiver Hearing, the State of Florida, on behalf of the OFR, made it clear that the State of Florida did not assert and could not demonstrate that the relief defendants, including FF Station, had engaged in such conduct.

33. On June 27, 2007, Pearlman was indicted for violations of 18 U.S.C. §§ 1344, 1341, and 1343, and charged with three counts of bank fraud, one count of mail fraud, and one count of wire fraud. On March 3, 2008, the United States filed a First Superseding Information which charged Pearlman with scheming to commit mail fraud, wire fraud, money laundering, and securities fraud in violation of 18 U.S.C. §§ 371, 1957, and 152(4).

34. On March 4, 2008, Pearlman entered into a Plea Agreement with respect to the First Superseding Information and agreed to plead guilty to: (i) two counts of conspiring to commit an offense against the United States in violation of 18 U.S.C. §371; (ii) one count of money laundering in violation of 18 U.S.C. §1957; and (iii) one count of presenting or using a false claim in a bankruptcy proceeding in violation of 18 U.S.C. §152(4).

35. In the Plea Agreement, Pearlman admits to: (i) using TCA and TCA Travel in the operation of a "ponzi" scheme based upon the fraudulent investments known as the E.I.S.A. program and

the sale stock in TCA Travel; (ii) engaging in a bank fraud scheme involving misrepresentations about Pearlman and several of his companies financial condition; and (iii) participating in a bankruptcy fraud scheme.

## The Fraudulent Transfers

36. On or about May 25, 2006, FF Station and Copper Star Bank ("Copper Star") executed a Loan Agreement, Mortgage, Assignment of Leases and Rents, Fixture Financing Statement, Security Agreement, and Promissory Note, under which Copper Star loaned FF Station $4,700,000.00 in exchange for a second mortgage on Church Street Station ("Second Mortgage").

37. On or about May 31, 2006, LJPE, as the sole managing member of FF Station, caused Copper Star to transfer by wire $2,970,000.00 (the "Second Mortgage Funds") to a bank account with Bank of America, N.A. in the name of LJPE.

38. On or about June 1, 2006, the Second Mortgage Funds were then transferred to another bank account within Bank of America, N.A., also in the name of LJPE.

39. The Second Mortgage Funds were transferred to LJPE with the actual intent to hinder, delay or defraud present and future creditors of FF Station.

40. FF Station received no fair consideration from LJPE in exchange for the Second Mortgage Funds.

41. FF Station was insolvent on the date of the transfer of the Second Mortgage Funds, and remained insolvent continuously thereafter.

42. At the time of the transfer of the Second Mortgage Funds, FF Station was engaged in a business or transaction for which the remaining property of FF Station constituted an unreasonably small amount of capital in relation to the business or transaction.

43. At the time of the transfer of the Second Mortgage Funds, FF Station intended to incur, believed or reasonably should have believed that it would incur, debts that would be beyond FF Station's ability to pay as they became due.

44. LJPE did not provide value to FF Station in exchange for the Second Mortgage Funds, nor did it take the Second Mortgage Funds in good faith.

45. But for the LJPE Bankruptcy Proceeding, FF Station could have avoided the transfer of the Second Mortgage Funds under 11 U.S.C. §§ 544 and 548, and Fla. Stat. §§ 726.105(1)(b), 726.106(1), and 726.108(1)(a).

46. On July 20, 2006, $200,000.00 of the Second Mortgage Funds were transferred from LJPE to Foley by check number 3334 (the "Payment"). A copy of the check is attached hereto as **Exhibit "A"** and is incorporated herein by reference.

47. Upon information and belief, the Payment was transferred to Foley as payment for legal services rendered to Pearlman and/or the TransCon Entities.

48. Foley did not provide value to either FF Station or LJPE in exchange for the Payment, nor did it take the Payment in good faith and without knowledge of the voidability of the transfer.

### COUNT I.
### FRAUDULENT TRANSFER RECEIVED BY
### FOLEY & LARDNER UNDER 11 U.S.C. §§548 AND 550(A)(2)

49. Paragraphs 1 through 49 inclusive are realleged and incorporated herein by reference.

50. This is an adversary proceeding to recover fraudulent transfers pursuant to 11 U.S.C. §§548 and 550(a)(2) from Foley as the immediate or mediate transferee of LJPE.

51. Within two years prior to the Petition Date, FF Station transferred, to or for the benefit of LJPE, the Second Mortgage Funds.

52. Within two years prior to the Petition Date, LJPE, the initial transferee, transferred the Payment to or for the benefit of Foley.

53. To the extent that the Second Mortgage Funds are avoidable, Foley as an immediate or mediate transferee of the avoided transfer is liable to the bankruptcy estate of FF Station for the value of the Payment.

54. The Second Mortgage Funds and the subsequent Payment were transfers of property of FF Station.

55. FF Station was insolvent at the time of the transfer or became insolvent as a result thereof.

56. FF Station was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital.

57. FF Station intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

58. FF Station received less than reasonable equivalent value in exchange for such transfer.

59. The Payment, as proceeds of the Second Mortgage Funds, was transferred with the actual intent to hinder, delay or defraud any entity to which FF Station was or became, on or after the date that such payments were made, indebted.

60. Foley did not take the Payment for value and in good faith, or without knowledge of the voidability of the transfer.

61. Pursuant to 11 U.S.C. § 550(a), the recovery of property for the benefit of FF Station's estate is authorized to the extent that the transfer is avoided under 11 U.S.C. § 548.

**WHEREFORE**, FF Station, LLC, requests that this Court enter a judgment against Foley: (i) avoiding the Payment pursuant to 11 U.S.C. §548; (ii) recovering the value of the Payment from Foley pursuant to 11 U.S.C. §550; (iii) granting pre-judgment interest from the date of the Payment; (iv) granting all costs from this action; and (v) for such other and further relief as the Court deems just and proper.

## COUNT II.
### FRAUDULENT TRANSFER RECEIVED BY DEFENDANT FOLEY & LARDNER UNDER 11 U.S.C. §§544(b) AND 550(A)(2), AND FLA. STAT. §§726.105(1)(a) AND (b), 726.106(1), AND 726.108

62. Paragraphs 1 through 62 inclusive are realleged and incorporated herein by reference.

63. This is an adversary proceeding to recover fraudulent transfers pursuant to 11 U.S.C. §§544(b) and 550(a)(2), and Fla. Stat. §726.101 *et seq.* from Foley is the immediate or mediate transferee of LJPE.

64. Within four years prior to the Petition Date, LJPE, as the initial transferee, transferred the Payment to or for the benefit of Foley.

65. To the extent that the Second Mortgage Funds are avoidable, Foley is an immediate or mediate transferee of the avoided transfer is liable to the bankruptcy estate of FF Station for the value of the Payment.

66. The Second Mortgage Funds and the subsequent Payment were transfers of property of FF Station.

67. FF Station was insolvent at the time of the transfer or became insolvent as a result thereof.

68. FF Station was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital.

69. FF Station intended to incur, or believed that it would incur, debts that would be beyond its' ability to pay as such debts matured.

70. FF Station received less than reasonable equivalent value in exchange for such transfer.

71. The Payment, as proceeds of the Second Mortgage Funds, was transferred with the actual intent to hinder, delay or defraud any entity to which FF Station was or became, on or after the date that such payments were made, indebted.

72. Foley did not take the Payment for value and in good faith, or without knowledge of the voidability of the transfer.

FF Station LLC
Case No. 6-07-BK-00575-ABB Adv. No. 08-                        13                        F:\Bkry\FFS LLC\Adversary\CopperStar\Foley and Lardner\pldg\Complaint.wpd

73. There is at least one actual holder of an allowed unsecured claim pursuant to 11 U.S.C. §502, who would have standing to assert a claim for relief under the Florida Uniform Fraudulent Transfer Act ("FUFTA").

74. The Payment is avoidable under Fla. Stat. §726.108(1)(a) and 11 U.S.C. §544(b).

75. Pursuant to 11 U.S.C. §550(a), the recovery of property for the benefit of FF Station's estate is authorized to the extent the Payment is avoided under 11 U.S.C. §544(b) and FUFTA.

**WHEREFORE**, FF Station LLC, requests that this Court enter a judgment against Foley: (i) avoiding the Payment pursuant to 11 U.S.C. §544(b) and Fla. Stat. §§726.105(1)(b), 726.106(1), and 726.108; (ii) recovering the value of the Payment from Foley, pursuant to 11 U.S.C. §550; (iii) granting pre-judgment interest from the date of the Payment; (iv) granting all costs from this action; and (v) for such other and further relief as the Court deems just and proper.

**RESPECTFULLY SUBMITTED**, this 19th day of February 2009.

s/ Elizabeth A. Green
Elizabeth A. Green
Florida Bar No. 0600547
egreen@lseblaw.com
**LATHAM, SHUKER, EDEN & BEAUDINE, LLP**
390 N. Orange Ave., Suite 600
Orlando, Florida 32802-3353
Tel: 407-481-5800; Fax: 407-481-5801
Attorneys for FF Station LLC

Amount:        $200,000.00
Account:       5489207526
Bank Number:   06300004

Sequence Number:  6540878016
Capture Date:     07/24/2006
Check Number:     3334

